In re Charles R. HOWARD, Penny S. Howard, Debtors.

Charles R. Howard, Plaintiff

v.

United States of America, Department of Treasury and Gerald A. Jeutter, Jr., Trustee, Defendants.

No. 99–01215–5–ATS.

United States Bankruptcy Court, E.D. North Carolina.

Sept. 18, 2003.

William E. Brewer, Raleigh, NC, for Debtors.

Gerald A. Jeutter, Raleigh, NC, trustee.

## MEMORANDUM OPINION

A. THOMAS SMALL, Bankruptcy Judge.

The trial of this adversary proceeding to determine whether the debtor, Charles R. Howard, owes a debt to the Internal Revenue Service ("IRS") under 26 U.S.C. § 6672 was held in Raleigh, North Carolina on September 4, 2003.

Charles R. Howard and Penny S. Howard filed a petition for relief under chapter 7 of the Bankruptcy Code on June 3, 1999. On April 18, 2002, the IRS assessed, Mr. Howard with a tax liability in the amount of $355,008.23 for unpaid payroll taxes of Howard Roofing Systems, Inc. ("HRS"), pursuant to 26 U.S.C. § 6672. Mr. Howard brought this adversary proceeding to challenge his liability for those taxes.

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(B), which this court may hear and determine.

Mr. Howard was the president and sole owner of HRS, a roofing construction company created in 1991. The IRS has assessed Mr. Howard for payroll taxes that were not paid by HRS for the quarters ending June 30, 1998, through June 30, 1999, contending that he is a "responsible party" who willfully failed to collect or pay over the tax or otherwise attempted to evade or defeat the payment of the tax as defined in 26 U.S.C. § 6672. Mr. Howard admits that he is a responsible party, but denies that he willfully failed to pay the trust fund taxes to the IRS. First, he contends that he did not know that the taxes were not being paid until April 6, 1999. Thereafter, while some company funds were paid to other creditors, Mr. Howard contends that these payments were made to increase the ultimate payout to the IRS.

Mr. Howard is a civil engineer licensed in five states, and has been an owner or officer of a construction and/or roofing business since 1977. The financial aspects of HRS were initially handled by Mr. Howard's wife, and as the company grew, others were hired to assist with payroll and related costs. Mr. Howard hired Karl Beyer as chief financial officer of HRS in April 1997 to handle, among other things, payroll, taxes, and preparation of financial and income statements.

In late 1997 and early 1998, HRS had several jobs that produced less revenue than expected. As a result, fiscal year 1998 showed a loss. Mr. Howard knew the company faced some financial difficulties, and began to look for outside funding. By April 1999, HRS had a letter of intent from an investor and was on the verge of closing on substantial funding. On the eve of closing, the investor backed out due to concerns with the financial situation, and Mr. Howard contacted another potential investor. That investor informed Mr. Howard that it had become aware of a tax lien filed against HRS for unpaid payroll taxes. Mr. Howard contends that this was the first time he had any information that the payroll taxes had not been paid, and that he realized immediately that HRS would have to close its doors. Mr. Howard then confronted Mr. Beyer, accusing him of failing to pay the payroll taxes without Mr. Howard's knowledge or consent.

Thereafter, Mr. Howard engaged in a scheme to maintain the appearance of normalcy at HRS so he could collect outstanding accounts receivable and pay as much money to the IRS as possible. Mr. Howard was advised by his attorneys and accountants that his bank, Centura, held a first lien on HRS's accounts receivable. In addition, most of HRS's jobs were bonded, and the bonding company would have the right to collect the receivables for any job it was required to pay for or perform. Acting on this information, as well as the knowledge that he would be personally responsible to pay the trust

fund taxes while his personal obligations to the bank and the bonding company would be discharged in bankruptcy, Mr. Howard tried to hide from Centura and the contractors or project owners the financial condition of the company so HRS could collect its receivables and turn them over to the IRS before Centura or the bonding company could seize them.

On April 7, 1999, HRS's Centura account had a balance of $28,008.[1] All of the payroll from the following week had not yet cleared, and the checks for the April 9 payroll had already been cut, but not delivered. Mr. Howard decided to honor the payroll checks, both because the employees had already performed the work for which they were being paid and to keep up the appearance that the company was continuing to operate. The April 9 payroll was made through the Centura account, and on April 15, Mr. Howard opened a new account at Triangle Bank to handle all transactions going forward.

After the April 9 payroll was made, no funds remained in the Centura account. HRS had some other loans with Centura for which payments were automatically drafted from this account, and Mr. Howard deposited $4,000 in the account to cover those drafts. It was his intent to have Centura believe that HRS was continuing to operate so it would not seize the accounts receivable. On April 7, 1999, Mr. Howard sent a check to the Colonial Days Inn, a hotel that was housing some HRS employees on an out-of-state job. According to Mr. Howard, Mr. Beyer told Mr. Howard that the account balance was suffi-

cient to cover this check.[2] In fact, the check was dishonored.

To open the Triangle Bank account, Mr. Howard deposited a check for $22,000 received in final payment for a job completed in Virginia. He paid the April 16 payroll of approximately $18,000, having laid off approximately one third of the workforce over the course of the prior week. On April 20, HRS collected a large receivable of $91,000 from Penn–Co. HRS maintained its employees on the Penn–Co job until April 23, hoping to keep the appearance of normal operations until the $91,000 check cleared. On April 19, Mr. Howard paid the company's portion of the health insurance payments for its employees. He testified that he understood that employees' claims may not have been paid if the insurance was not brought current, so he chose to make this payment of $18,410.49. On April 21, HRS received $61,010.90 for payment on the Henrico County job, but when the HRS employees were pulled from the job on April 23, Henrico County stopped payment on its check.

From April 23 through June 1, HRS continued to collect some accounts receivable and made payments such as payroll, telephone bills, utilities, and office expenses. Mr. Howard received his regular salary through May 28. He made payments on some vehicles in order to later sell them at a profit. He also paid $12,000 toward a settlement with American Buildings, avoiding execution on a confession of judgment with both personal and corporate pledges. On June 2, 1999, HRS made a payment to the IRS in the amount of

---

1. Mr. Howard transferred $33,000 from his personal account to the HRS account on April 2, 1999, after Mr. Beyer told him HRS would be short for the payroll checks. Mr. Howard testified that it was his understanding that this amount would cover the "total burden" of payroll, including the taxes. This deposit

also predates his admitted knowledge of the fact that the payroll taxes had not been made.

2. Mr. Howard testified that he did not have the password for the financial program on the computer, and he relied on Mr. Beyer to keep him informed as to the status of the accounts.

$74,000. Mr. Howard contends that this payment could not have been made absent his efforts to keep the appearance of an operating company to collect the accounts receivable. He points to the Henrico County stopped check to support his contention, noting that as soon as the owner learned that the job may not be finished, payments to HRS ceased. Mr. Howard contends that the IRS received substantially more money than it would have, had HRS closed its doors and filed chapter 7 on April 7, 1999.

Mr. Howard further testified that, after learning of the unpaid payroll taxes, he gained control of documents that had been in Mr. Beyer's files, including correspondence between the IRS and HRS. On April 8, he received a printout from Mr. Beyer showing lump sum checks made from Mr. Beyer to the IRS on behalf of the IRS. These checks were handwritten, as opposed to computer generated, and were signed with Mr. Howard's signature stamp. Mr. Howard testified that he did not authorize these checks, and that in the operations of HRS only the vice president had access to his signature stamp. The stamp was only to be used when Mr. Howard was away, and he was to approve all checks either in advance or after the fact. Mr. Howard testified that he did not authorize these checks. He contends that Mr. Beyer made these lump sum payments off the books and without his knowledge so that Mr. Howard would not learn that Mr. Beyer had not been paying the payroll taxes. There were eight of these checks, totaling approximately $600,000.

When asked how he could have operated the business without knowing that the payroll taxes were not paid, Mr. Howard testified that Mr. Beyer handled all of the financial transactions. Mr. Howard was shown financial statements or balance sheets, but he was never shown any document that showed the payroll taxes were owed. He assumed that the financial statements were accurate, but now he knows that from 1997 forward, they were doctored on a monthly basis. He contends that Mr. Beyer credited one account and showed the unpaid taxes as an adjustment to payables. Mr. Howard said he managed the business by reviewing income statements, which showed the money coming in and line item expenses, and he assumed the numbers on the statements were accurate. According to Mr. Howard, there was nothing on any of the statements that would make him suspicious that the payroll taxes were not being paid.

In stark contrast to Mr. Howard's testimony, Mr. Beyer testified that not only did Mr. Howard know that the payroll taxes were not being paid, but he directed Mr. Beyer not to pay them and he directed how to adjust the income statements and financial statements to disguise the payroll tax deficiency. When HRS began having cash flow problems in late 1997, Mr. Howard decided which checks to issue and which bills could wait. Mr. Howard selected the vendors with priority, and he intended to use the expected investment funds to pay the deferred taxes. To maintain the appearance of current taxes for the potential investors, Mr. Howard instructed Mr. Beyer to move the payroll taxes from the tax liability account to accounts payable. Mr. Beyer testified that it was readily apparent that the accounts payable amount was larger than it should have been, given the number of active jobs.

Mr. Beyer also testified that it was common for checks to be handwritten, and that he used the signature stamp at the direction of Mr. Howard. He had Mr. Howard's authorization to issue the lump sum checks to the IRS, and they were handwritten for simplicity. Mr. Beyer further testified that Mr. Howard reviewed the notices from the IRS regarding the delinquent taxes, and that Mr. Howard saw the

460

computer printouts of the correct liabilities. In addition, the Form 941 tax returns showed the unpaid taxes, but Mr. Beyer did not recall showing those returns to Mr. Howard.

Gina Byrd, who was employed at HRS part-time in the accounts payable department, testified that both Mr. Beyer and the vice president had access to the signature stamp. She said that it was not unheard of for Mr. Beyer to issue handwritten checks where time was a problem. Ms. Byrd also testified that she witnessed the beginning of a confrontation between Mr. Howard and Mr. Beyer in April 1999 in which Mr. Howard said to Mr. Beyer, "You caused me to lose my company by not paying taxes." Ms. Byrd said it appeared to her that Mr. Howard was in disbelief that the taxes had not been paid.

Section 6672(a) of the Internal Revenue Code provides, in relevant part, that

[a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

■ The key question for the court to determine is whether Mr. Howard knew before April 1999 that the payroll taxes had not been paid. The testimony is diametrically opposed, and the court's decision ultimately is a credibility determination. The court observes that Mr. Howard is an astute businessman. While he had never failed to pay payroll taxes in the past, perhaps he never faced the severe financial problems that he faced in 1998. Construction companies are acutely aware

of the sources of funds, the need for funds and which creditors' payments can be delayed. It is simply not credible that Mr. Howard did not know that the payroll taxes were not being paid. At the very least, he recklessly disregarded whether the taxes were being paid.

Significantly, Mr. Beyer had no incentive to make the decision not to pay the taxes and to keep Mr. Howard uninformed about it. Had Mr. Beyer been embezzling funds or gaining personally from the failure to pay, this might be a different case. Mr. Howard had everything to lose, and gambled that he would be able to pay the taxes once the investment was achieved and his business turned around. Mr. Howard either directed that the taxes not be paid or knowingly let the taxes not be paid while the books were manipulated, and the court finds that this was a willful failure to pay taxes under 26 U.S.C. § 6672.

■ Once HRS was rejected by potential investors and the tax lien appeared on the public record, Mr. Howard knew his time was up, and he decided to pay as much as possible to the IRS. While that may be commendable, under the law his decision to pay other creditors before paying the IRS constitutes a willful failure to pay. *Turpin v. United States*, 970 F.2d 1344, 1347 (4th Cir.1992) (intentional preference of others over the United States is sufficient to establish willfulness under § 6672). Because the IRS has already assessed these taxes, Mr. Howard has the burden of proof to show that he did not willfully fail to pay. Mr. Howard has failed to meet his burden of proof, and the court concludes that he is liable for the trust fund taxes under 26 U.S.C. § 6672.

Judgment will be entered accordingly.